IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

KEITH DEE,                           *
                                     *
        Plaintiff,                   *
                                     *
v.                                   *
                                     *            CV 114-176
                                     *
BOARD OF REGENTS OF THE              *
UNIVERSITY SYSTEM OF GEORGIA,        *
d/b/a Georgia Regents                *
University,                          *
                                     *
        Defendant.                   *
                                     *
                                     *

**O R D E R**

Currently before the Court is Defendant's motion for summary judgment. (Doc. 31.) For the reasons explained below, Defendant's motion is **GRANTED**.

## I.   Factual Background

This case arises from Plaintiff Keith Dee's employment with the Medical College of Georgia ("MCG" or "Defendant").[1] After completing medical school in Ohio, Plaintiff was accepted into an anesthesiology residency program at MCG. (Doc. 31, Ex. 5 ("Pl. Dep.") at 12.) While Plaintiff was employed at MCG, Dr.

---

[1] The Medical College of Georgia's name has changed multiple times, and at the time this litigation began, it was known as Georgia Regents University. But at the time of the underlying events, it was still known as the Medical College of Georgia. Because the parties' filings refer to Defendant as MCG, the Court will do the same.

Alvin Head was the chair of the anesthesiology department, and Dr. James Mayfield, Jr. was the assistant chair of the department. (Id. at 15.)

In June 2008, Plaintiff injured his back. (Id. at 20.) After over-the-counter medicines failed to relieve his pain, Plaintiff wrote a prescription to his girlfriend for Lortab, and Plaintiff took the medication himself. (Id. at 21.) When Lortab did not work, Plaintiff began taking Percocet. (Id. at 21.) By January 2009, Plaintiff was routinely taking three pain pills per day. (Id. at 25.)

In February 2009, agents from the Drug Enforcement Agency ("DEA") visited MCG regarding an investigation into Plaintiff's prescription writing, and Plaintiff acknowledged that he had written the prescriptions to his girlfriend. (Id. at 26-28.) Following the meeting, Dr. Head asked Plaintiff if he had been taking the medications he had prescribed. (Id. at 28.) When Plaintiff answered that he had, Dr. Head informed him that a drug test would be appropriate, and Plaintiff consented. (Id. at 28-29.) Plaintiff tested positive for Percocet and was placed on administrative leave. (Id. at 31.) Dr. Head also suggested that Plaintiff receive a substance-abuse evaluation and recommended that he see Dr. Steven Lynn at the Ridgeview Institute ("Ridgeview") in Atlanta. (Id. at 31-32.) Plaintiff agreed to the evaluation. (Id. at 32.)

In March 2009, Plaintiff visited Ridgeview and met with Dr. Lynn. (Id. at 48-49.) After Plaintiff's evaluation, Dr. Lynn wrote Dr. Head and informed him that he recommended that Plaintiff enter a treatment program, which typically lasts six to ten weeks.[2] (Doc. 32, Ex. 1. ("Lynn Dep.") at 38.) Plaintiff was admitted into treatment on March 23, 2009. (Id. at 41.) While away from work and in treatment, Plaintiff used Family Medical Leave Act ("FMLA") leave.

Dr. Lynn initially placed Plaintiff in a six-week program, but moved him into a twelve-week program a week after he began treatment. (Id. at 45-46, 58.) Two or three weeks after starting treatment, Plaintiff called Dr. Mayfield and informed him that things seemed to be progressing well and that he looked forward to returning to MCG, and Dr. Mayfield responded that he looked forward to having Plaintiff back. (Id. at 76.)

During the course of Plaintiff's treatment, Dr. Lynn spoke with Dr. Head two or three times. (Id. at 49.) And, Dr. Lynn testified, it is normal procedure for Ridgeview to send updates to employers, though he was not sure how often it sent out Plaintiff's updates. (Id. at 49-50.) During one of his calls with Dr. Head, Dr. Lynn informed Dr. Head that Plaintiff's treatment had been extended, but the specifics and date of this

---

[2] Although his letter says six to ten weeks, Dr. Lynn's testimony clarified that the program actually lasts six to twelve weeks. (Lynn Dep. at 43-44.)

conversation are not on the record. (Doc. 31, Ex. 7 ("Head Dep.") at 52-53.)

On April 27, 2009, MCG sent a letter to Plaintiff's home in Augusta informing him that his FMLA leave would exhaust on May 8, 2009 and that he was expected to return to work on May 11, 2009.[3] (Pl. Dep., Ex. 9.) The letter further provided that, if he were unable to return to work by May 11, he should contact his department or the human resources office as soon as possible. (Pl. Dep., Ex. 9.) Because Plaintiff resided at Ridgeview at the time MCG sent the letter, he did not immediately receive it. (Id. at 73-75.) Instead, his girlfriend, who was checking his mail and taking care of his house at the time, signed for the letter on May 5. (Id. at 75.) Although Plaintiff may have seen the letter while still in treatment, he claims that he did not see the letter before May 8. (Id. at 75.) MCG sent a second letter on May 11 informing Plaintiff that he had not provided the requested information and requested that he provide the information no later than May 26. (Pl. Dep., Ex. 8.) Plaintiff maintains that he never received this letter. (Id. at 75.)

For most of May 2009, while Dr. Head was on vacation, Dr. Eugene Betts was the acting head of the anesthesiology department. (Doc. 31, Ex. 8 ("Betts Dep.") at 19.) While

_____

[3] Plaintiff had previously used a few weeks of his FMLA leave earlier in the year while he recovered from an illness. (Pl. Dep. at 22.)

acting as interim department head, Dr. Betts requested, through Dr. Lynn, that Plaintiff call him. (Pl. Dep. at 80-81; Betts Dep. at 17.) Plaintiff called Dr. Betts on May 20 and learned that MCG had decided to terminate his employment because he had not reported back to work or informed MCG about any possible return and offered him the option to resign. (Pl. Dep. at 82-83; Betts Dep. at 28.) Plaintiff agreed to resign and signed a resignation letter that, upon Dr. Betts's request, he backdated to May 8 to reflect the day that his FMLA leave expired. (Betts Dep. at 17.)

## II.    **Procedural Background**

In August 2009, Plaintiff submitted an EEOC intake questionnaire. (Pl. Dep., Ex. 13.) In return, Plaintiff received a letter from the EEOC informing him that he had not adequately filed a charge of discrimination. (Pl. Dep., Ex. 14.) In May 2010, Plaintiff filed a formal charge of discrimination with the EEOC and received a right-to-sue letter on April 7, 2014. (Pl. Dep., Exs. 15, 16.) Plaintiff initiated this action on July 2, 2014, and MCG removed to this Court on September 2, 2014. (Doc. 1.) Plaintiff's complaint alleges a cause of action under the Americans with Disabilities Act ("ADA") for failing to accommodate his disability and a state-

law breach-of-contract claim. MCG now moves for summary judgment.

### III. **Legal Standard**

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor." U.S. v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-

movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a

material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk of the Court gave Plaintiff notice of the motion for summary judgment and informed him of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 33.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motion is now ripe for consideration.

## IV.  Discussion

MCG moves for summary judgment on multiple grounds. The Court addresses each of the arguments below.

## 1.  Failure to Exhaust Administrative Remedies

As noted above, Plaintiff completed and submitted an intake questionnaire with the EEOC, which was not verified, and he subsequently learned that the questionnaire did not constitute a valid charge.  The same day that Plaintiff received the letter informing him of the questionnaire's deficiencies, Plaintiff called the EEOC.  (Pl. Dep. at 109.)  Then, as noted above, Plaintiff filed a charge in May 2010.

When an employee wishes to bring a claim under the Americans with Disabilities Act ("ADA"), he must file a charge with the EEOC within 180 days from the date of the unlawful employment act.  42 U.S.C. § 2000e-5; 42 U.S.C. § 12117 (providing that 42 U.S.C. § 2000e-5's procedures apply to ADA clams); see also Chesnut v. Ethan Allen Retail, Inc., 971 F. Supp. 2d 1223, 1229 (N.D. Ga. 2013).  Charges must be made in writing and verified — that is, sworn under oath.  29 C.F.R. § 1601.9.

Under EEOC regulations, a charge should include: (1) the name, address, and telephone number of the charging party; (2) the name, address, and telephone number of the charged party, if it is known; (3) a clear, concise statement of the facts

constituting the unlawful act; (4) the approximate number of employees employed by the charged party; and (5) a statement disclosing any state-law proceedings based on the acts. 29 C.F.R. § 1601.12. To be minimally sufficient, however, a charge need only contain "'a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of.'" Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1318 (11th Cir. 2001) (quoting 29 C.F.R. § 1601.12). Moreover, a charging party may amend his charge "to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations" made in the original charge. 29 C.F.R. § 1601.12(b). Amendments will relate back to the original filing as long as they address the same subject matter as the original charge. 29 C.F.R. § 1601.12; Edelman v. Lynchburg College, 535 U.S. 106, 115-17 (2002).

Although not typically treated as such, intake questionnaires may be considered charges in certain situations. Wilkerson, 270 F.3d at 1318-1320 (finding that an intake questionnaire that was verified and met the basic requirements of a charge was sufficient to be considered a charge). The court in Wilkerson adopted a manifest-intent approach for determining whether a filing should be treated as a charge, which requires a determination of whether a reasonable person

10

would find that the plaintiff "manifested her intent to activate the machinery" of the statute by filing a questionnaire. Id. at 1320. To aid in making that determination, the Wilkerson court provided a non-exhaustive list of considerations, including the plaintiff's interaction with the EEOC, what the questionnaire indicated, and how the EEOC responded. Id. at 1320.

In this case, it is undisputed that Plaintiff's August 2009 questionnaire was not verified, while his May 2010 filing was, and that the May 2010 filing was outside the 180-day window. Accordingly, whether Plaintiff timely exhausted his administrative remedies turns on whether his May 2010 filing cured his August 2009 filing. MCG essentially argues that it does not because his intake questionnaire did not sufficiently show his intent to initiate an ADA claim and that his May 2010 presents an entirely new claim instead of an amendment. The Court disagrees.

The questionnaire Plaintiff completed in August 2009 provides the names, addresses, and phone numbers of both Plaintiff and MCG, the number of MCG employees, and the following short statement:

> My physician in treatment discussed my condition with the chair of my department, Dr. Al Head that I will need 12 weeks of treatment for chemical dependency. Dr. Head agreed with the evaluation and stated that my position would be held for me until I finished treatment. While on vacation out of the country Dr. Head was replaced by Dr. Eugene Bett[]s and Dr. Bett[]s told my physician that I

11

needed to resign by 5/18 or I will be terminated.  I was
under contract until June 30, 2009 and policies and
procedures state that if out of work for medical condition
all leave will be exhausted for pay then employee will be
placed on administrative leave [without] pay until he
returns.  FMLA was never discussed or certified although
that is their reason for termination.  I never received
due process as the policy of the program states before
dismissal.  I was not compensated from 4/1/09-6/30/09 as
other residents in the same treatment center from same
institution were.  Therefore I believe I was unfairly
forced to resign under duress for my medical condition and
that my contract was not honored as policy states from
MCG.  Letter sent to me also stated that I did not inform
dept of my intentions before termination.  This is untrue
as my physician was in constant contact with Dr. Head
while I was in treatment.

(Pl. Dep., Ex. 13.)  Notably, two pages below Plaintiff's

statement of the facts, the questionnaire notes that "[i]f you

would like to file a charge of discrimination, you must do so

within 180 or 300 days from the day you knew about the

discrimination . . . .  If you want to file a charge, you

should check Box 1, below." (Id.)  Box 1 states, in part: "I

want to file a charge of discrimination, and I authorize the

EEOC to look into the discrimination I described above." (Id.)

Plaintiff checked box 1.  Because this questionnaire clearly

identifies the parties and describes the acts, 29 C.F.R.

§ 1601.12, and shows Plaintiff's intent to activate the

administrative machinery, Wilkerson, 270 F.3d at 1319-20, the

Court is satisfied that the questionnaire is sufficient to

constitute a charge — had it been verified.  The evidence also

indicates that Plaintiff thought he was filing a charge when he

12

filed the questionnaire. (Pl. Dep. at 109.)   Further, after
receiving the letter informing him that he had not formally
filed a charge, Plaintiff met with an EEOC employee in November
2009 about his claim and informed that person that he wanted to
file a charge.   (Id. at 111.)   And the EEOC employee informed
Plaintiff that the EEOC would look into the allegations.   (Id.
at 111.)

However, because Plaintiff did not verify the
questionnaire, Plaintiff's claim may survive only if the May
2010 filing cures the verification defect.   As discussed above,
the May 2010 filing will relate back and cure the defect if it
grew out of the same subject matter.   29 C.F.R. § 1601.12.   If
the May 2010 filing raised entirely new allegations based on new
facts, it will not be considered an amendment to the original
filing.   See Chesnut, 971 F. Supp. 2d at 1233.   MCG claims that
the allegations in the May 2010 filing do not relate to the
allegations raised in the questionnaire, and, therefore, cannot
be used to amend the questionnaire.   The Court disagrees.

While Plaintiff's statement in the questionnaire may not
specifically mention the ADA or reasonable accommodations, it
alleges facts that arguably support an ADA claim.   Importantly,
Plaintiff's May 2010 filing alleges an ADA claim based on the
exact actions alleged in the questionnaire — that MCG did not
accommodate him while he underwent addiction treatment.   (Pl.

13

Dep., Ex. 15.)  Because Plaintiff's May 2010 filing clarified and amplified his August 2009 filing, the Court finds that it relates back under 29 C.F.R. § 1601.12.  Accordingly, summary judgment is not appropriate on this issue.

## 2.   ADA Failure to Accommodate

Plaintiff alleges that MCG violated the ADA when it failed to accommodate his disability, and MCG now moves for summary judgment on this claim.  Because Plaintiff never requested or identified an accommodation that would have allowed him to perform the essential functions of his job, the Court finds summary judgment on this issue appropriate.

Under the ADA, an employer may not "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."   42 U.S.C. § 12112(a); Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001).  To establish a prima facie case under the ADA, a plaintiff must demonstrate that: "(1) he is disabled; (2) he was a qualified individual at the relevant time, meaning he could perform the essential functions of the job in question with or without reasonable accommodations; and (3) he was discriminated against because of his disability."  Lucas, 257

F.3d at 1255 (citation omitted) (internal quotation marks omitted).

One form of discrimination under the ADA arises when an employer fails to reasonably accommodate an employee's disability. Lucas, 257 F.3d at 1255. "An accommodation can qualify as reasonable, and thus be required by the ADA, only if it enables the employee to perform the essential functions of the job." Lucas, 257 F.3d at 1255 (internal quotation marks omitted). It is the plaintiff's burden to identify an accommodation and to demonstrate that it will allow him to perform the essential functions of the job. Lucas, 257 F.3d at 1255-56; Rabb v. Sch. Bd. of Orange Cty., 590 F. App'x 849, 850 (11th Cir. 2014) (per curiam) ("The plaintiff bears the burden both to identify an accommodation and show that it is reasonable."). In this case, MCG does not dispute that Plaintiff was disabled. Additionally, neither side directly addresses the essential functions of Plaintiff's job. For purposes of this motion, the Court assumes attending work was an essential function of Plaintiff's job.

Further, a plaintiff will not succeed on a failure-to-accommodate claim unless he requested an accommodation. Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363 (11th Cir. 1999) ("[T]he duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has

15

been made . . . ."). The exact form that a request must take, however, is not entirely clear in this circuit. See Holly v. Clairson Indus., LLC, 492 F.3d 1247, 1261 n.14 (11th Cir. 2007); see also Hunt v. Aimco Props., LP, __ F.3d __, 2016 WL 659197, *8 (11th Cir. Feb. 18, 2016) (noting, in a Fair Housing Act case, that when a defendant knows of a plaintiff's disability and of the plaintiff's wish to be accommodated, the request requirement may be met).

In this case, even under a liberal application of the requirement that he make a request, Plaintiff has not established that he made a request for an accommodation. The evidence shows that Plaintiff had the ability to call out from Ridgeview while he was undergoing treatment. And it is undisputed that he spoke to Dr. Mayfield a few weeks after entering treatment. Yet, even after being placed in the twelve-week program, Plaintiff never called or wrote to MCG to request an extension of his medical leave or any other accommodation. Moreover, although Plaintiff claims that he was under the impression that Dr. Lynn was keeping MCG updated on his treatment, there is no indication that he ever instructed or requested Dr. Lynn to request an accommodation from MCG. Notably, after Plaintiff's FMLA leave had expired and Dr. Betts informed Plaintiff that his employment would be terminated if he did not resign, Plaintiff still did not request an extension of

16

his leave or any other accommodation. Instead, he consented to Dr. Betts's request for his resignation. Accordingly, although MCG was aware of Plaintiff's disability, there is no evidence that it was aware of his wish to be accommodated.

More importantly, the record reflects that Plaintiff has never identified an accommodation that would have permitted him to perform the essential functions of the job. In his response brief, Plaintiff notes that extended leave to complete his treatment may have been a reasonable accommodation. (Doc. 36 at 5.) Plaintiff then argues that MCG failed to produce any evidence that such an accommodation would not permit Plaintiff to perform the essential functions of his job. (Doc. 36 at 5.)

Although extended leave — as opposed to indefinite leave — may be a reasonable accommodation, Spears v. Creel, 607 F. App'x 943, 950 (11th Cir. 2015) (per curiam), it is Plaintiff's burden to establish the existence of an accommodation and the reasonableness of the accommodation. Lucas, 257 F.3d at 1255-56. Plaintiff has failed to point to any evidence that, had he been permitted to extend his leave until he completed his treatment, he would have been able to perform the essential functions of his job. The only evidence on the issue that the Court has located is Dr. Lynn's testimony. Dr. Lynn testified that, although he did not officially evaluate Plaintiff for return to his position, Plaintiff would not have been able to

17

return to anesthesiology at the end of his treatment. (Lynn Dep. at 97.) Indeed, Dr. Lynn testified that, on average, an anesthesiologist will not be permitted to return to work, if ever, for six months after completing treatment. (Id. at 97-98.) Accordingly, even if Plaintiff had requested this accommodation, he has not pointed to any evidence that establishes that it would have allowed him to perform the essential functions of his job.[4] Moreover, because Plaintiff has not pointed to any evidence supporting the reasonableness of the accommodation, MCG was not obligated to prove its unreasonableness.

Plaintiff also cites 29 C.F.R. § 1630.2(o)(3) and argues that, because MCG was aware of Plaintiff's disability, it should have known that he needed an accommodation. 29 C.F.R. § 1630.2(o)(3) provides that an employer may, in some cases, need to engage in an "informal, interactive process" in order to determine the appropriate reasonable accommodation. But the law in this circuit is clear that "the ADA provides no cause of action for the 'failure to investigate' possible accommodations . . . ." Willis v. Conopco, Inc., 108 F.3d 282,

---

[4] MCG also argues that any other request for leave by Plaintiff would be for indefinite leave and unreasonable. The Court declines to address this issue at length because the evidence does not suggest that Plaintiff requested any extended leave. But to the extent that Plaintiff argues that he was entitled to indefinite leave, his argument fails because indefinite leave is not a reasonable accommodation. Wood v. Green, 323 F.3d 1309, 1314 (11th Cir. 2003).

285 (11th Cir. 1997). And, even assuming an employer has a duty to interact, failure to engage in the interactive process is irrelevant when the employee has not shown a possible reasonable accommodation. Id. ("[W]here a plaintiff cannot demonstrate reasonable accommodation, the employer's lack of investigation into reasonable accommodation is unimportant." (internal quotation marks omitted)). Indeed, "[w]here the employee fails to identify a reasonable accommodation, the employer has no affirmative duty to engage in an 'interactive process' or to show undue hardship." Spears v. Creel, 607 F. App'x 943, 948 (11th Cir. 2015); Smith v. Bruno's Supermarkets, Inc., No. 04-0730-CB-M, 2006 WL 2456084, *5 (S.D. Ala. Aug. 22, 2006) ("[W]hatever the duty to interact may be, it does not arise unless plaintiff has proven that a reasonable accommodation was possible.").

Plaintiff essentially argues that, because MCG was on notice of his disability, it was required to initiate the interactive process and determine the appropriate reasonable accommodation. Because Plaintiff has not pointed to any evidence that would establish the existence of a reasonable accommodation, MCG's failure to investigate or otherwise engage in an interactive process is unimportant. Willis, 108 F.3d at 285.

Because Plaintiff has not shown that he requested an accommodation, and because Plaintiff has not produced any evidence that identifies an accommodation that would have enabled him to perform the essential functions of his job, the Court **GRANTS** summary judgment on this issue.

### 3. MCG's Leave Policy

Plaintiff asserts that the evidence indicates that MCG maintained a policy under which it terminated employees' employment once their FMLA leave expired. And, according to Plaintiff, such a policy violates the ADA. To support his position, Plaintiff cites an EEOC enforcement guideline that provides, in part:

> If an employee with a disability needs additional unpaid leave as a reasonable accommodation, the employer must modify its "no-fault" leave policy to provide the employee with the additional leave, unless it can show that: (1) there is another effective accommodation that would enable the person to perform the essential functions of his/her position, or (2) granting additional leave would cause an undue hardship. Modifying workplace policies, including leave policies, is a form of reasonable accommodation.

Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, 2002 WL 31994335, at *15 (Oct. 17, 2002) (footnote omitted). Plaintiff reads this guideline to mean that an employer must always increase a disabled employee's leave time. Accordingly, under Plaintiff's interpretation, the guideline

required MCG to automatically extend Plaintiff's leave time because he was in treatment.

The Court disagrees with Plaintiff's interpretation. The guideline does not require an employer to automatically extend leave time. Instead, it provides that an employer must modify its leave policy when extending leave time is a reasonable accommodation. Hwang v. Kan. State Univ., 753 F.3d 1159, 1163-64 (10th Cir. 2014). That is, this requirement is only triggered when a plaintiff has established that he is entitled to additional leave as a reasonable accommodation and a no-fault policy would otherwise prevent additional leave. Id. Moreover, the conditions mentioned in the guideline — another effective accommodation and undue hardship — come into effect only after the plaintiff has established that modifying the leave policy is a reasonable accommodation. Id. "Indeed, the enumerated conditions discuss an affirmative defense and remedial measures — issues that arise only after the plaintiff establishes liability." Id.

Because Plaintiff has not established that he was entitled to additional leave time as a reasonable accommodation, MCG has not violated this guideline.[5]

---

[5] The Court addresses the merits of this argument because it was able to easily reach its conclusion on the issue. But the Court questions whether Plaintiff's complaint raises an ADA claim based on this alleged policy.

21

Accordingly, to the extent Plaintiff argues that MCG's alleged no-fault policy violates the ADA, the Court **GRANTS** summary judgment in favor of MCG on this issue.

**4. Disparate Treatment Under the ADA**

A small portion of MCG's motion for summary judgment argues that any claim for disparate treatment under the ADA fails as a matter of law. Plaintiff's response makes clear that his case is based solely on MCG's failure to accommodate his disability. (Doc. 36 at 18.) Nonetheless, Plaintiff's response goes on to explain that the facts of the case support a disparate-treatment claim. Although the Court questions whether Plaintiff raised this claim in his complaint, for completeness' sake, the Court will briefly address the alleged claim.

The McDonnell Douglas, burden-shifting framework applies to disparate-treatment claims under the ADA. EEOC v. Eckerd Corp., No. 1:10-cv-2816-JEC, 2012 WL 2726766, at *10 (N.D. Ga. July 9, 2012). In order to bring a claim for disparate treatment, Plaintiff must establish a prima facie case, which requires that he show that he is: (1) disabled; (2) qualified; and (3) was subjected to unlawful discrimination because of his disability. Earl v. Mervyns, Inc., 207 F.3d 1361, 1365 (11th Cir. 2000) (per curiam). As discussed above, a qualified individual is someone who can perform the

22

essential functions of the job with or without reasonable accommodation. Lucas, 257 F.3d at 1255 (citation omitted) (internal quotation marks omitted). Plaintiff has not established that he was able to perform the essential functions of the job with or without reasonable accommodation and cannot establish a prima facie case of disparate treatment. See Eckerd Corp., 2012 WL 2726766, at *10. Accordingly, to the extent Plaintiff's complaint raises a disparate-treatment claim, the Court **GRANTS** summary judgment.

## 5. Plaintiff's Breach-of-Contract Claim

Plaintiff alleges that MCG breached its contract with Plaintiff when it requested his resignation. Plaintiff relies on a provision found in MCG's policies and procedures relating to chemical and substance abuse, which provides:

> Although the Medical College of Georgia and MCG Health, Inc. is committed to appropriate assistance for House Officers[6] with chemical dependence and/or substance abuse, untreated or relapsing dependence is judged to be incompatible with safe clinical performance. Termination through due process may result if a House Officer fails to comply with a rehabilitation program or meet goals as outlined by the department Chairperson or Program Director.

(Pl. Dep., Ex. 19.) Plaintiff maintains that this paragraph prevented MCG from terminating his employment because he was progressing well in his treatment. That is, Plaintiff argues that MCG breached this agreement.

---

[6] A resident is a House Officer. (Pl. Dep., Ex. 19.)

23

Under Georgia law, "[t]he construction of a contract is a question of law for the court." O.C.G.A. § 13-2-1. "When the terms of a contract are clear and unambiguous, the reviewing court looks only to the contract itself to determine the parties' intent." Unified Gov't of Athens-Clarke Cty. v. Stiles Apartments, Inc., 764 S.E.2d 403, 407 (Ga. 2014).

Here, putting aside the fact that Plaintiff resigned from his position, the unambiguous language in the paragraph above does not support Plaintiff's claim. The clear language provides that failure to comply with a treatment program may result in termination of employment. It does not, however, provide that MCG may not terminate an employee who is in compliance with a program for a different reason. MCG maintains that it requested Plaintiff's resignation because he had exhausted his FMLA leave and not returned to work, and Plaintiff does not dispute this reason. Accordingly, the Court **GRANTS** summary judgment on this issue.

## V.   Conclusion

For the reasons discussed above, Defendant MCG's motion for summary judgment (doc. 31) is **GRANTED**. The Clerk is instructed to **ENTER JUDGMENT** against Plaintiff and in favor of Defendant. The Clerk shall **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia this 30th day of March, 2016.

```
_____
HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA
```